1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| THOMAS OUIA HAITHCOCK,<br><br>                              Petitioner,<br><br>vs.<br><br>M. VEAL, Warden,<br><br>                              Respondent. | Civil No.       06-cv-0100-MMA(JMA)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE PETITION FOR WRIT OF HABEAS CORPUS** |
|---|---|

State prisoner Thomas Ovia[1] Haithcock ("Haithcock"), proceeding *pro se* and *in forma pauperis* with a Petition For Writ Of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition"), seeks relief from his May 2004 conviction and sentence for possessing and selling cocaine base, as charged in San Diego County Superior Court Case No. SDC179790.  There is no dispute his January 17, 2006 Petition was timely filed, and the two grounds for habeas relief presented are exhausted.  Respondent filed an Answer, and Haithcock filed a Traverse.  (Dkt Nos. 29, 31.)  Intervening proceedings memorialized in the docket, including an appeal to the Ninth Circuit, account for the delay in reaching the Petition merits.  In consideration of the lodged record and controlling legal authority, and for the reasons discussed below, it is now recommended the Petition be **DENIED**.

---

[1]  *See* Lodg. 1, RT Vol. 5, 260:21.

1

# I.       BACKGROUND

Federal habeas courts presume the correctness of "a determination of a factual issue made by a State court." 28 U.S.C. § 2254(e)(1). The only state court opinion of record addressing the merits of Haithcock's claims is the August 10, 2005 Court of Appeal decision affirming his conviction and sentence. (Lodg. 6.)[2] As pertinent here, the Court of Appeal recited the following facts:

> On January 11, 2004, at around 6:00 p.m., the San Diego Police Narcotics Unit conducted a "buy/bust" operation in the area of 1500 Island Avenue in San Diego. This type of operation normally consists of an undercover operative purchasing illegal narcotics from a street-level dealer, followed by several other uniformed officers moving in to arrest the people involved in the sale. On this occasion, Officer William Martinez was the undercover agent, dressed in street clothes and equipped with two $20 bills and one $10 bill, the serial numbers of which had been prerecorded for comparison purposes after the arrest of the alleged drug dealers. Several other police officers were nearby in unmarked cars, ready to assist in providing surveillance and arrest, should a successful purchase of narcotics occur.

> Officer Martinez approached a group of approximately 10 people on the 500 block of 15th Street and engaged Grace Cartwright in a conversation in which he asked to buy $40 of rock cocaine. Cartwright instructed Officer Martinez to follow her, and he did so. They walked several blocks and stopped near the 1400 block of J Street. Officer Martinez gave Cartwright the two prerecorded $20 bills, and Cartwright gave Officer Martinez a watch to hold for collateral while she went to retrieve the drugs. Cartwright walked down the block, while Officer Martinez watched and waited for her to return.

> Cartwright stopped in front of a chain link fence surrounding 1453 J Street. Appellant [Haithcock] approached Cartwright from the other side of the fence, and, after engaging her in a brief conversation, the two exchanged something between their hands. Appellant walked back to the doorway of the house and engaged in another hand-to-hand transaction with Kim Harris. Appellant returned to Cartwright and again exchanged something between their hands and then returned to the house. While Officer Martinez could not see the hand-to-hand exchange between appellant and Harris from his vantage point, several other officers in nearby unmarked cars observed the transaction.

> Cartwright returned to Officer Martinez and placed approximately 0.55 grams of rock cocaine on a green electrical box

---

[2]   Respondent's Notice of Lodgment lists the lodged documents. (Dkt No. 30.) However, the documents themselves were not labeled correspondingly. The Reporter's Transcript ("RT"), identified as Lodgment 1, is comprised of six volumes. The Clerk's Transcript ("CT") is identified as a one-volume Lodgment 2, whereas the lodged record has three CT volumes. The main volume contains Bates-numbered pages 0001 through 0115. One of the other CT volumes, designated on its cover "Augment Clerk's Transcript," contains four items of correspondence from Haithcock addressed to particular judges in April and May 2004.

near them.  Martinez picked up the rock cocaine and began to walk away.  Cartwright called to Martinez and asked for a piece of the rock cocaine.  Martinez said he could not do that, gave her the prerecorded $10 bill instead and walked away.  [FN 2: Cartwright expected either money or a piece of the narcotics in return for her assistance.]

After Officer Martinez gave the signal, officers moved in to arrest appellant, Cartwright, and Harris.  Officer Vernon Peterson detained Cartwright.  Detective Davies and Officer Hall arrested appellant.  Officer Michael Moran arrested Harris.  Officers saw Cartwright drop a $10 bill.  They retrieved it and confirmed it was the prerecorded $10 bill.  While searching Harris, officers found the two prerecorded $20 bills in her possession.  Harris later told police officers she lived at 1453 J Street and appellant was involved in the narcotics transaction.  Appellant also told officers he lived at 1453 J Street.

(Lodg. 6, pp. 2-4.)

A February 9, 2004 Information charged Haithcock with two criminal counts:  (1) selling a controlled substance (CAL. HEALTH & SAFETY CODE § 11352(a)), with the special allegation under CAL. PENAL CODE § 1203.073(b)(7) the controlled substance was cocaine base, and (2) possession of cocaine base for sale (CAL. HEALTH & SAFETY CODE § 11351.5).  (Lodg. 2, Clerk's Transcript ("CT") at 1-2.)  The Information also alleged Haithcock had been previously convicted of a serious or violent felony under CAL. PENAL CODE § 245(a)(1) in August 1999 (SDC147045) for which he served a prison term, a strike prior pursuant to CAL. PENAL CODE §§ 667.5(b) through (i), 1170.12, and 668.  (CT at 3.)  On May 3, 2004, a motion to bifurcate the trial of Haithcock's alleged prison and strike priors became moot when he admitted both the allegations.  (CT at 103; Lodg. 1, Reporter's Transcript ("RT") Vol. 4, pp. 47-54.)

Trial lasted three days.  Haithcock testified on his own behalf.  (CT at 109-110; RT Vol. 5, pp. 260-290.)  On May 6, 2004, during their deliberations, the jury requested and received a readback of all his testimony.  Within one-half hour thereafter, the jury convicted him of the two charged counts.  (CT at 111-114; RT Vol. 6, pp. 240-344.)  On June 4, 2004, the court sentenced him to the upper term of five years on Count 1, doubled for the prior strike conviction, for a total term of ten years in state prison.  The court dismissed Count 2 as a lesser included offense and struck the prior prison term allegation.  (CT at 115; RT Vol. 6, pp. 352-355.)

On January 19, 2005, Haithcock filed an appeal alleging the same two grounds for relief he presents in his federal Petition:  (1) the trial court abused its discretion to deny each of his two pretrial

motions to substitute appointed defense counsel, in violation of his Sixth Amendment representation rights, and (2) the trial court denied him due process when it sentenced him to the upper term based on aggravating factors he did not admit and the jury did not find. (Lodg. 3.) The Court of Appeal affirmed the judgment on August 10, 2005, in an unpublished, reasoned decision. (Lodg. 6.) Haithcock sought review in the California Supreme Court, raising the same two claims. (Lodg. 7). On October 21 2005, that court summarily denied review, the last state court proceeding before he filed his federal Petition. (Lodg. 8.)

On February 28, 2006, just over a month after he filed his federal Petition, Haithcock filed a state habeas petition in Superior Court, asserting the same two claims rejected on direct appeal and adding two new claims: ineffective assistance of trial and appellate counsel and a Confrontation Clause violation based on the arresting officer's allegedly inadmissible hearsay testimony. He pursued collateral relief in the state courts through the California Supreme Court's summary denial on March 21, 2007, as substantiated in an attachment to his February 10, 2009 Motion To Amend/Correct his federal Petition. (Dkt No. 51.)

On March 27, 2006, Haithcock had filed a Motion To Stay his federal habeas proceedings and to hold the Petition in abeyance while he pursued exhaustion of his two new claims and collateral review of his original claims in state court. (Dkt No. 10.) Respondent opposed the motion (Dkt No. 12), and Haithcock filed a Reply (Dkt No. 28). By Order entered November 7, 2006, the District Judge then assigned to this case adopted the Report and Recommendation of the undersigned Magistrate Judge that the stay and abeyance motion be denied. (Dkt No. 38). Haithcock filed a Notice Of Appeal of that result on December 13, 2006. (Dkt No. 39.) His appeal was dismissed on January 23, 2009 for lack of jurisdiction because the denial of a stay and abeyance motion is not a final and appealable order.[3] (Dkt No. 49.) In the interim, the parties had filed their Answer and Traverse to the federal Petition, in June 2006 and July 2006 respectively. (Dkt Nos. 29, 31.)

//

---

[3] Haithcock noticed his appeal of the stay and abeyance denial on December 13, 2006. (Dkt No. 39.) Nearly a year later, on December 3, 2007, the Ninth Circuit ordered appointment of counsel for the appeal, finding it "unclear" whether the denial of such a motion is a final, appealable Order, instructing the parties to brief that issue, and granting a COA on the issue whether the district court abused its discretion in denying that motion. (Dkt No. 46.) The appeal was dismissed for lack of jurisdiction on January 23, 2009. (Dkt No. 49.)

1    On February 10, 2009, just over two weeks after the Ninth Circuit dismissed his appeal of the

2    stay and abeyance denial, Haithcock filed a Motion To Amend his Petition to add the two new claims

3    he had raised in his state court collateral proceedings.  (Dkt No. 51.)  Respondent opposed the motion

4    (Dkt No. 54), and after extensions of time, Haithcock filed a Reply (Dkt No. 62).  Before the motion

5    was decided, Haithcock attempted to file a First Amended Petition, which was rejected.  (Dkt No. 60).

6    On September 24, 2009, the motion was denied on grounds amendment would be futile because the

7    amended petition would not relate back to the filing date of his original petition, inasmuch as the new

8    claims did not arise out of the same "conduct, transaction or occurrence" (FED. R. CIV. P. 15(c)(2)),

9    and thus were time-barred under the one-year statute of limitations of 28 U.S.C. § 2244(d)(1).  (Dkt

10   No. 64, 5:16-18); *see* Mayle v. Felix, 545 U.S. 644, 656-57 (2005).  Therefore, the claims at issue

11   remain the two grounds for relief Haithcock presented in his original federal Petition:  challenges to

12   the trial court's denial of his two Marsden motions for substitute counsel and to his upper-term

13   sentence.

**II.    DISCUSSION**

   **A.    Legal Standards For Federal Habeas Relief**

16       A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person

17   in custody pursuant to the judgment of a State court only on the ground he is in custody in violation

18   of the Constitution or laws or treaties of the United States."  28 U.S.C.A. § 2254(a).  Federal habeas

19   courts are bound by a state's interpretation of its own law.  Estelle v. McGuire, 502 U.S. 62, 68 (1991)

20   (federal courts may not reexamine state court determinations on state-law questions); Oxborrow v.

21   Eikenberry, 877 F.2d 1395, 1400 (9th Cir. 1989) ("errors of state law do not concern us unless they

22   rise to the level of a constitutional violation"); Jackson v. Ylst, 921 F.2d  882, 885 (9th Cir. 1990)

23   (federal courts "have no authority to review a state's application of its own laws").  Habeas relief is

24   warranted only if constitutional error occurred and the error was structural or the trial error had a

25   " 'substantial and injurious effect or influence in determining the jury's verdict.' "  Penry v. Johnson,

26   532 U.S. 782, 795 (2001), *quoting* Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

27       Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and

28   Effective Death Penalty Act of 1996 ("AEDPA").  *See* Lindh v. Murphy, 521 U.S. 320, 322-23 (1997).

1  Haithcock mistakenly asserts AEDPA "does not apply to Petitioner['s] claim[s]." (Dkt No. 31, p. 2.)

2  AEDPA establishes a " 'highly deferential standard for evaluating state-court rulings,' " requiring "that

3  state-court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24

4  (2002), *quoting* Lindh, 521 U.S. at 333 n.7.  The petitioner has "the burden of rebutting the

5  presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  Federal

6  habeas relief is warranted only if the result of a claim adjudicated on the merits by a state court "was

7  contrary to, or involved an unreasonable application of clearly established Federal law, as determined

8  by the Supreme Court of the United States," or "was based on an unreasonable determination of the

9  facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see* Bell

10  v. Cone, 535 U.S. 685, 694 (2002).  A decision is "contrary to" federal law if (1) it applies a rule that

11  contradicts governing Supreme Court authority, or (2) it "confronts a set of facts that are materially

12  indistinguishable from" a Supreme Court decision but reaches a different result. Early v. Packer, 537

13  U.S. 3, 8 (2002) (citations omitted).  To be found "unreasonable," the application of the precedent

14  "must have been more than incorrect or erroneous;" it "must have been 'objectively unreasonable.' "

15  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citation omitted); *see* Middleton v. McNeil, 541 U.S.

16  433, 436 (2004).  A federal court applies AEDPA standards to the "last reasoned decision" by a state

17  court. Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005); *see* Ylst v. Nunnemaker, 501 U.S. 797,

18  803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later

19  unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground").

20  **B.     Ground One:  Sixth Amendment Violation**

21       Haithcock alleges his "conviction must be reversed because my 6th Amendment right to

22  counsel was violated with the [*sic*] trial court abused its discretion by denying Petitioner['s] Marsden

23  motion[s]." (Pet. p. 7.)  The denial of a motion to substitute counsel can be considered in a habeas

24  proceeding. *See* Robinson v. Kramer, 588 F.3d 1212 (9th Cir. 2009).  "It is well established and clear

25  that the Sixth Amendment requires on the record an appropriate inquiry into the grounds for such a

26  motion, and that the matter be resolved on the merits before the case goes forward." Schell v. Witek,

27  218 F.3d 1017, 1025 (9th Cir. 2000) (*en banc*).  This claim encompasses only the allegedly prejudicial

28  \\

6

error Haithcock ascribes to the trial courts' refusal to substitute counsel.  The merits of his ineffective assistance of counsel contentions are not before the Court as a separate ground.  (*See* Dkt Nos. 60, 64.)

The Sixth Amendment accords a defendant the right to receive the assistance of counsel at every critical stage of criminal proceedings.  Gideon v. Wainwright, 372 U.S. 335 (1963).  The right to counsel encompasses the right to reasonably effective assistance.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  The "purpose of providing assistance of counsel 'is simply to ensure that criminal defendants receive a fair trial.' " Wheat v. United States, 486 U.S. 153, 159 (1988), *quoting* Strickland, 466 U.S. at 689; *see* United States v. Cronic, 466 U.S. 648, 653-57 (1984) ("the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial").  A defendant has a qualified right to retained counsel of choice, but an indigent defendant, while entitled to appointed counsel, is not entitled to appointed counsel of choice.  Hendricks v. Zenon, 993 F.2d 664, 671 (9th Cir.1993); *see* Morris v. Slappy, 461 U.S. 1, 14 (1983) (holding the Sixth Amendment requires only competent representation and does not guarantee a "meaningful relationship" between a defendant and counsel).

> Thus, the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.  If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance.

Cronic, 466 U.S. at 657, n. 21.

"[A] state trial court has no discretion to ignore an indigent defendant's timely motion to relieve an appointed attorney." Schell, 218 F.3d at 1025, 1026-27 (remanding for evidentiary hearing where state court had failed to make any inquiry into the substance of defendant's claims alleging breakdown of attorney-petitioner relationship, so there was no record of how far that relationship had deteriorated).  Even a brief inquiry into the reasons for the defendant's dissatisfaction can be sufficient.  *See* Hudson v. Rushen, 686 F.2d 826, 829 (9th Cir. 1982).

> [T]he ultimate constitutional question the federal courts must answer here is not whether the state trial court "abused its discretion" in not deciding [the petitioner's] motion, but whether this error actually violated [the petitioner's] constitutional rights in that the conflict between [the petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment.

06cv0100

1   <u>Schell</u>, 218 F.3d at 1026, 1024-25 (overruling the "abuse of discretion" test described in <u>Bland v.</u>

2   <u>California Dep't of Corrections</u>, 20 F.3d 1469, 1475 (9th Cir. 1994) as the correct standard of review

3   "to examine the constitutionality of a state court's handling of a motion to substitute appointed counsel

4   based on allegations of an irreconcilable conflict").

5        The <u>Schell</u> court clarified that the three-part <u>Bland</u> protocol is "of course . . . the correct

6   methodology for reviewing federal cases on direct appeal," but "our focus is different on direct review

7   than in the context of a § 2254 proceeding." <u>Schell</u>, 218 F.3d at 1025; *see* <u>Coleman v. Thompson</u>, 501

8   U.S. 722, 730 (1991) ("The [habeas] court does not review a judgment, but the lawfulness of the

9   petitioner's custody *simpliciter*"). Accordingly, a "federal court reviewing a state court determination

10  in a habeas corpus proceeding ordinarily applies a harmless error standard, examining whether the

11  error 'had substantial and injurious effect or influence' on the trial." <u>Schell</u>, 218 F.3d at 1022, *quoting*

12  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993). "Not every conflict or disagreement between the

13  defendant and counsel implicates Sixth Amendment rights." <u>Schell</u>, 218 F.3d at 1026-28. "Under this

14  standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not

15  entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual

16  prejudice.' " <u>Brecht</u>, 507 U.S. at 637.

17       Haithcock became dissatisfied with his appointed public defender and moved twice to have

18  him replaced. Unlike in <u>Schell</u>, two trial courts looked into the merits of Haithcock's serious

19  allegations and created a detailed record of his complaints, his attorney's responses at hearings on the

20  record, and the degree of responsibility Haithcock himself bore for the breakdown in the relationship.[4]

21  He nevertheless contends the determinations to deny him substitute counsel were "unreasonable" and

22  a violation of his "Sixth Amendment right to counsel, which then violated my Fourteenth Amendment

23  [right] to a fair trial." (Dkt No. 31, pp. 2-3.) He summarily asserts "Petitioner would of [*sic*] been

24  found '<u>not</u>' guilty if Petitioner had an attorney that would have done his job as a[n] attorney. . . ." (<u>Id.</u>)

25  \\

26

27       [4]  Haithcock's first motion was heard by Hon. Bernard E. Revak on April 5, 2004. The second was
heard by Hon. Peter C. Deddeh on April 27, 2004. Trial began May 3, 2004, presided over by Hon. Laura
28   Palmer Hammes.

A defendant has no automatic right to the substitution of counsel because of dissatisfaction with counsel's performance.  Jackson v. Ylst, 921 F.2d 882, 888 (9th Cir. 1990).  Only irreconcilable conflicts which constructively deny the defendant any counsel whatsoever implicate the Sixth Amendment.  Daniels v. Woodford, 428 F.3d 1181, 1197 (9th Cir. 2005); *see* Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir. 2007) (an "irreconcilable conflict in violation of the Sixth Amendment occurs only where there is a complete breakdown in communication between the attorney and client, *and* the breakdown prevents effective assistance of counsel") (emphasis added).  Where a defendant has "completely lost trust in his attorney" and has "legitimate reason" for doing so, a court may find constructive denial of counsel in violation of the Sixth Amendment.  Daniels, 428 F.3d at 1198-99.  However, if the defendant's refusal to cooperate with counsel "demonstrates 'unreasonable contumacy,' " a court's refusal to remove the attorney does not support a finding the defendant was denied counsel.  Id. (citations omitted).

The California standard in People v. Marsden, 2 Cal.3d 118 (1970) substantially parallels federal law.  *See* Hudson, 686 F.2d at 829.  "[A] claim a trial court unconstitutionally denied a defendant's Marsden motion is in essence a claim that the trial court failed to recognize that the defendant's complaints as to his counsel were such that, if true, counsel's performance fell below the Sixth Amendment standard for effective assistance of counsel." Robinson, 588 F.3d at 1215 n.1, 1216, *citing* Schell, 218 F.3d at 1021.  A defendant requesting substitute counsel must have the opportunity to present his reasons for dissatisfaction with the representation.  Marsden, 2 Cal.3d at 123-24.  "[S]ubstitution is a matter of judicial discretion" after consideration of "any specific examples of counsel's inadequate representation that the defendant wishes to enumerate." People v. Horton, 11 Cal.4th 1068, 1102 (1995), *quoting* Marsden, 2 Cal.3d at 124; *see* People v. Earp, 20 Cal. 4th 826, 876 (1999).)  A Marsden motion need be granted only if the record "clearly" shows " ' that the first appointed attorney is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. ' "  (*See* Lodg. 6, p. 7, *quoting* People v. Hart, 20 Cal.4th 546, 603 (1999).)

The conflicts between Haithcock and his attorney were fully explored on the record at both his Marsden motion hearings.  (Lodg. 1, RT Vols. 2, 3.)  As summarized by the Court of Appeal:

Prior to trial, appellant made two separate motions, asking the court to replace his appointed counsel. On each occasion, in accord with *People v. Marsden* (1970) 2 Cal.3d 118, the trial court afforded appellant a hearing to plead his motion, as well as giving his counsel an opportunity to respond. Because the judge in each motion found no legally compelling reason to grant the request, each judge denied his motion. Appellant contends the trial court abused its discretion in failing to grant either of his *Marsden* motions. We disagree.

(Log. 6, p. 5.)

The first <u>Marsden</u> motion hearing was held on April 5, 2004:

During this first *Marsden* hearing, appellant voiced several concerns regarding George Peterson, his appointed counsel. He complained of the infrequency of his communication with Peterson, noting they had only discussed his case on one prior occasion. Appellant expressed an unfavorable opinion of his attorney's performance, stating: "You know, he's not trying – he's not doing a very good job." Appellant also expressed dissatisfaction with Peterson's suggestion it would be difficult to prove [Haithcock's version of the] story regarding the alleged crime to the jury. The court gave Peterson an opportunity to respond to the accusations. He mentioned [among other things] an occasion in which appellant hung up the telephone during an attempt to discuss the case. Peterson also explained an extended period of illness had made it difficult to meet with the appellant as planned.

The judge denied appellant's *Marsden* motion because he did not "see any reason to replace Mr. Peterson." The judge explained to appellant that Peterson had simply been explaining "some of the realities" of the case, and that "just because you don't like the message, you know, you don't shoot the messenger."

(Lodg. 6, pp. 5-6.)

The second <u>Marsden</u> motion hearing was held on April 27, 2004:

During this second *Marsden* hearing, appellant made similar claims regarding the length of time Peterson spent with him discussing the case. He claimed he called Peterson's office multiple times and that individuals hung up the telephone. Because appellant believed firmly in his innocence, he expressed displeasure with Peterson discussing any outcome other than acquittal. In response, Peterson explained several individuals in his office refused to take appellant's calls because of the nature of his previous contacts. Peterson further stated his belief appellant had "done everything he possibly" could to destroy the attorney-client relationship. Because of the difficulty in the relationship, Peterson advised the court "that there is an irreconcilable difference between us, because he has made every effort to tarnish and to destroy any relationship that existed prior to the series of communications and *Marsden* hearing." Peterson proceeded to ask the court to grant appellant's *Marsden* motion.

\\

> The judge denied appellant's motion because none of the reasons stated "legally compel" the appointment of a new attorney. The judge explained a sufficient basis for granting a *Marsden* motion is not found just "because two people can't get along."

(Lodg. 6, pp. 6-7.)

Merely reciting "the number of times one sees his attorney, and the way in which one relates with his attorney" does not compel substitution of counsel. (Lodg. 6, p. 8 (citations omitted). "[A] defendant may not effectively veto the appointment of counsel by claiming a lack of trust in, or the inability to get along with appointed counsel," and "[a] disagreement concerning tactics is . . . insufficient to compel the discharge of appointed counsel, unless it signals a complete breakdown in the attorney-client relationship." (Id. (citations omitted).) Applying those standards, the Court of Appeal found no abuse of discretion in Haithcock's case.

> In each motion, appellant expressed concerns about his counsel, but none of them constituted reasons such that any reasonable judge would have granted his motions.  His attorney provided representation at the preliminary hearing and readiness conference.   He conducted discovery, reviewed the preliminary hearing transcripts and remained in touch with appellant by telephone and letters.  When his counsel was ill, other attorneys filled in for him from the Alternative Public Defenders Office.  At neither *Marsden* hearing did appellant present a basis for concluding he was inadequately represented.

(Lodg. 6, p. 8.)

The Court of Appeal further observed: "Even if a judge abused his or her discretion in denying a *Marsden* motion, we will not reverse unless 'the error in the trial court was prejudicial to defendant' " applying Chapman v. California, 386 U.S. 18, 24 (1967).  (Lodg. 6, p. 8.)  Under Chapman, a court on direct review will not disturb the result unless there was constitutional error in denial of the Marsden motions and the error was not harmless beyond a reasonable doubt.  The Court of Appeal concluded Haithcock showed no prejudice, so that any error was harmless:

> The evidence against appellant was substantial.[5]  Appellant's counsel presented reasonable defenses.  Appellant's counsel made concerted efforts to defend his client and appeared to thoroughly understand the case.

(Lodg. 6, p. 9.)

---

[5] For example, the prosecutor called each of the four police officers who participated in the "buy/bust" operation, each of whom was an eyewitness to the illicit transaction.  (Lodg. 1, RT Vol. 4, pp. 61-209.)

A federal habeas court applies the harmless error standard of Brecht to constitutional error by the state courts, rather than the "harmless beyond a reasonable doubt" standard of Chapman. *See* Baines v. Cambra, 204 F.3d 964, 977 (9th Cir. 2000) (holding that Brecht harmless error standard applies in all 28 U.S.C. § 2254 federal habeas corpus independent reviews regardless of the standard, if any, applied by the state courts). Haithcock has failed to establish denial of his motions to substitute counsel entailed constitutional error or, even if it did, that the error "had substantial and injurious effect or influence" on the trial. Brecht, 507 U.S. at 623.

Haithcock's primary complaints relate to trial tactics. It is well-settled that strategic and tactical matters fall within trial counsel's discretion, and a defendant's disagreement does not necessitate substitution of counsel. United States v. Wadsworth, 830 F.2d 1500, 1509 (9th Cir.1987) ("appointed counsel, and not his client, is in charge of the choice of trial tactics and the theory of defense"), *citing* Henry v. Mississippi, 379 U.S. 443, 451 (1965). Haithcock complained that no defense witnesses were called, even though he told his attorney and the court that he wanted witness testimony at trial. That "never happen[ed], just like everything else." (Petition, pp. 7-8.) In particular, he had asked his attorney to subpoena Grace Cartwright, one of his co-defendants, who would testify that he did not participate in the drug transaction. Haithcock's attempt to blame his attorney for her absence as a defense witness contradicts the factual record. Counsel actually attempted to procure her trial testimony, but she invoked her Fifth Amendment rights.[6] (CT at 105; RT Vol. 4, pp. 108-109). Thus, her absence as a defense witness was not an omission attributable to counsel's shortcoming, nor could it have been remedied by substitute counsel. Haithcock also accuses his attorney of missing a couple of court appearances, in particular, the second Marsden hearing initially convened on April 23, 2004. However, the record reflects the court's own notice mistake excused counsel's absence, and the motion hearing went forward four days later.[7]

---

[6] After the jury was excused on the first day of trial, Cartwright appeared with her attorney. She had already been sentenced to a six-year term under the same plea deal prosecutors had offered Haithcock. However, her appeal time had not elapsed, and she apparently faced other charges in pending matters, so she chose not to testify at Haithcock's trial. (CT at 105; Lodg. 1, Vol. 4, pp. 108-109.)

[7] In resetting the hearing for April 27, 2004, the court informed Haithcock: "It looks like the court screwed up." (Petition Exh. B, p. 32.)

12

Haithcock also complains about the lack of communication and the infrequency of his meetings with counsel: "I knew what Mr. Peterson was going to do at the trial the same time that the jury heard Mr. Peterson that's when I found out my defense.  Nothing." (Petition pp. 7-8.)  He summarily observes his attorney "just wanted to make a deal" and "did not want to go to trial;" "he just wanted to get paid and not do anything;" he "believ[ed] what the police said.   (Id.)  He argues: "If I had paid Mr. Peterson would have listened to what I had to say," and the court should have granted his motion based on the conflict they had.  (Petition pp. 7-8.)  However, Haithcock's impressions do not equate with any actual failure to prepare the case for trial.  This Court has reviewed the record and concludes the Court of Appeal reasonably found the conflict between Haithcock and his counsel did not pose a risk of (or result in) a constitutionally inadequate defense.

The record substantiates counsel's thorough understanding of the evidence and readiness for trial.  Defense counsel extensively addressed all the issues Haithcock raised, including the steps he had taken to investigate and prepare his defense and examples of areas where he hoped to create reasonable doubt in the jurors' minds.  He emphasized the "enormous burden on whoever represents" Haithcock because of "the hand-to hand sale" witnessed by several police officers who would no doubt testify at trial, and "the fact of the recovery of the narcotics, the money, the number of officers involved, versus the testimony of Mr. Haithcock." (Lodg. 1, RT Vol. 3, p. 34.)  He also described "the enormous amount of information which may, or may not, be in the possession of the prosecution" adverse to Haithcock discovered by his investigator.  (Id. pp. 34-35.)  Moreover, Haithcock testified on his own behalf and was able to present his version of events to the jury.  (RT Vol. 5, pp. 260-290).

In summary, the trial courts made full, appropriate, and interactive inquiries into Haithcock's complaints and the extent of the attorney-client conflict in deciding his Marsden motions.  See Schell, 218 F.3d 1017.  Haithcock had the opportunity to explain all his reasons for wanting new counsel.  The trial courts developed an ample record to make an informed decision that Haithcock's conflict with his attorney would not deprive him of a fair trial, as found by the Court of Appeal, whose factual findings are entitled to deference.  28 U.S.C. § 2254(e)(1).  For all the foregoing reasons, this Court recommends a finding the state court's decision on the merits of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, nor did it involve an

06cv0100

1    objectively unreasonable determination of the facts from the record presented.  28 U.S.C. § 2254(d).

2    It is accordingly recommended habeas relief on Ground One be  **DENIED**.

3        **C.      Ground Two:  Imposition Of Upper Term Sentence**

4        Haithcock alleges in Ground Two the trial court's imposition of the five-year upper term under

5    California's three-tier determinate sentencing scheme ("DSL") must be reversed because the factors

6    used to depart from the middle term were neither admitted by him nor found true by a jury, in violation

7    of Blakely v. Washington, 542 U.S. 296 (2004).   (Petition, pp. 9-10.)   The Court of Appeal

8    summarized the sentencing record in its August 10, 2005 decision:

9                     On June 10, 2004, the court imposed the upper term of five
                 years on count 1, doubling it to 10 years for the strike prior.  Factors in
10               mitigation included the relatively small amount of cocaine involved in
                 the crime.   Factors in aggravation included **prior convictions**, the
11               seriousness of prior convictions, **the fact appellant was on parole at
                 the time of this offense**, lack of remorse, lack of understanding of the
12               severity of the crime, and the prospect of appellant being a danger to
                 the community.   The court dismissed count 2 as a lesser included
13               offense **and struck the prison prior enhancement because the court
                 considered it as an aggravating factor in the imposition of the
14               upper term for count 1.**

15   (Lodg. 6, pp. 4-5 (emphasis added).)

16       Following the jury's guilty verdicts on both charged counts, the court observed: "The serious

17   question is the term that the Court will impose and which will be doubled by the existing strike."[8]

18   (Lodg. 1, RT Vol. 6, 348:8-10.)  Haithcock addressed the court regarding his personal circumstances,

19   acknowledging the truth of his 1999 prior conviction. (Lodg. 1, RT Vol. 6, 350:13-351:6.)   The

20   prosecutor argued for an upper term sentence, as recommended by the Probation Department,

21   emphasizing, among other things, Haithcock's "lengthy criminal history."[9]   (Id. at 351:10-352:6.)

22   Although the trial court identified several other factors in support of an upper term sentence,

23

24       [8]  "MR. PETERSON:  Mr. Haithcock understands that he has a strike. . . . He understands that, as a
     result of the strike, the sentence that the Court may impose on either Count 1 or Count 2 must be doubled. . . . "
25   (Lodg. 1, RT Vol. 6, 347:20-25; see also Lodg. 1, RT Vol. 4, 53:27-54:8.)

26       [9]  "[W]hat makes this an upper term case appropriate is his lengthy criminal history.  And it should be
     noted included in his history are possible additional strike offenses . . ., but the People did not allege them.  And
27   that inures to the benefit of the defendant.  And I'm speaking of the two robbery convictions, the abduction
     conviction, and also the aggravated assault conviction.  [¶]  We attempted to allege those.  We were unable to
28   in a timely fashion . . . . I only cite those cases to show the upper term is warranted when we have someone who
     has a serious criminal history and who fails to remain law-abiding."  (Lodg. 1, RT Vol. 6 at 351-352.)

Haithcock's admitted prior conviction and his documented criminal record appear to have been decisive considerations in the selection of the upper-term sentence.

> [T]he Court looks at this case, first of all, as one in which, **but for the record** would have been probation. Small amount, facilitator, not the actual holder of the drugs by the evidence. And it would have been probation, but in looking at this record, I am appalled. **This is an extremely serious criminal record.** And the defendant was on parole at the time of this crime. . . .
>
> First of all, looking at the overview, there are 19 adult convictions in the past, and they include -- and this is just a summary fashion. And I'm reading from Page 11 of the probation report, just taking the highlights of it. Since 1973, two[] counts of robbery, assault and battery twice, contempt three times, resisting arrest, criminal mischief, abduction, felony assault, disorderly conduct, aggravated assault, drug abuse twice, fighting in public, driving under the influence, and assault with a deadly weapon with force likely to produce great bodily injury.
>
> The crime for which you are on parole, Mr. Haithcock, is one of the most serious I've ever seen.. . . . [¶]  And this came after a previous assault on another girlfriend  . . . .
>
> **So I don't find that you are A, remorseful, B, understand the severity of what you are doing or, C, pose any prospect of being anything but a danger to the community, and therefore it is necessary to impose the upper term**. . . .
>
> **And in aggravation I look at the prior convictions, which are numerous and extremely serious, the fact that you were on parole at the time of this offense,** and the fact that your prior performance on parole and probation has been bad and **you've continued to reoffend** throughout your entire lifetime, so therefor I find that the aggravants outweigh the mitigants.

(Lodg. 1, RT Vol. 6 at 353-355 (emphasis added); CT at 353-354.)

At the time Haithcock was sentenced, California's DSL required the court to impose the middle term "unless there are circumstances in aggravation or mitigation of the crime." People v. Black ("Black I"), 35 Cal.4th 1238, 1247 (2005), *judgment vacated by* Black v. California, 549 U.S. 1190 (2007).  The California Rules Of Court provide a nonexhaustive list of aggravating circumstances, including facts "relating to the crime," facts "relating to the defendant," and "[a]ny other facts statutorily declared to be circumstances in aggravation." CAL.R.CT. 4.421(b)-(c).  The sentencing court was empowered at the time to impose the upper term if it expressly considered all the relevant facts and found the circumstances in aggravation outweighed the circumstances in mitigation. CAL

R CT. 4.420.  None of the aggravating facts needed to be found by a jury beyond a reasonable doubt. Rather, the trial court could find the particular aggravating facts by a preponderance of the evidence.

In his August 2005 Petition For Review to the California Supreme Court, Haithcock had argued  his sentencing judge erred in making factual findings to support his aggravated sentence. (Lodg. 7, p. 18.:  "The decision in <u>Blakely</u> renders unconstitutional portions of the California determinate sentencing scheme . . ., including the portion of Penal Code section 1170, subdivision (b), authorizing judges to make factual findings in connection with aggravating factors used to impose the aggravated term.")  His argument also relied on <u>Apprendi</u> and <u>Booker</u> for the proposition:  "all of the aggravating allegations used to increase his sentence were subject to proof beyond-a-reasonable-doubt standard, and should have been tried to a jury if they were going to be used to aggravate the defendant's sentence." (Lodg. 7 p. 20.)  He contended there, as here:  "Because all of the factors relied upon by the trial court were inappropriately found and considered by the trial court, the aggravated sentence imposed by the court was unauthorized, and violated petitioner's Sixth Amendment right to a jury trial under the United States Constitution." (<u>Id.</u>)        In denying this claim in August 2005, the Court of Appeal had simply stated:  "The California Supreme Court recently examined California's determinate sentencing structure and found it does not violate the criteria for sentencing stated in <u>Blakely</u>"  (Lodg. 6, p. 9, *citing* <u>Black I</u>, 35 Cal.4th 1238.)

The <u>Black I</u> court had concluded the upper term, rather than the middle term, qualified as the relevant statutory maximum for sentencing purposes and held there is no right to jury fact-finding when a court imposes a sentence within the maximum authorized by a jury's verdict of guilt. However, in February 2007, the United States Supreme Court vacated <u>Black I</u>  and "remanded to the California Supreme Court for further consideration in light of" <u>Cunningham v. California</u>, 549 U.S. 270 (2007).[10]  <u>Black v. California</u>, 549 U.S. 1190 (2007).

The <u>Cunningham</u> Court had invalidated California's DSL insofar as it authorized a judge rather

----

[10]  Respondent's June 30, 2006 Answer to Haithcock's federal Petition signaled that the United States Supreme Court had granted *certiorari* in <u>Cunningham</u> on February 21, 2006 so that the issue of the constitutionality of California's DSL was still pending. (Dkt No. 29, Answer at 12 n.1.) Respondent's reliance on the <u>Black I</u> court's rationale must be rejected in consideration of the <u>Cunningham</u> decision.

than a jury to find facts exposing a defendant to the upper term sentence, as a violation of the defendant's right to a trial by jury, applying Apprendi v. New Jersey, 530 U.S. 466, 468-69. 471 (2000), Blakely, 542 U.S. 296, and United States v. Booker, 543 U.S. 220, 243-44 (2005) (converting the federal sentencing guidelines from mandatory to advisory to comport with the Sixth Amendment). Cunningham, 549 U.S. at 274-75, 292-93. "Contrary to the Black [I] court's holding, our decisions from Apprendi to Booker point to the middle term specified in California's statutes, not the upper term, as the relevant statutory maximum." Id. at 293, 288 (the "statutory maximum" for Apprendi purposes "is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*"), *quoting* Blakely, 542 U.S. at 303 (emphasis in original). "[U]nder the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." Id. at 281, *citing* Jones v. United States, 526 U.S. 227 (1999) *and* Apprendi, 530 U.S. at 468-69. 471 (same, "[o]ther than the fact of a prior conviction"); *see also* Almendarez-Torres v. United States, 523 U.S. 224, 241-46 (1998) (recognizing the prior conviction exception). "If the jury's verdict alone does not authorize the sentence, if instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied."[11] Cunningham, 549 U.S. at 289-92, *citing* Blakely, 542 U.S. at 305.

Because the Cunningham opinion applied the reasoning of Apprendi and Blakely to California's DSL, the Ninth Circuit has concluded it therefore announced no new constitutional rule and may be applied retroactively. Butler v. Curry, 528 F.3d 624, 636 (9th Cir.), *cert. denied sub nom* Curry v. Butler, -- U.S. --, 129 S.Ct. 767 (2008). "[W]here a federal habeas petitioner's conviction became final between Blakely and Cunningham, the rule in Cunningham should be retroactively applied under Teague v. Lane, 489 U.S. 288 (1989)." Chioino v. Kernan, 581 F.3d 1182, 1184 n.1 (9th Cir. 2009), *citing* Butler, 528 F.3d at 639. Haithcock was sentenced on June 4, 2004, twenty days

---

[11] "In sum, California's DSL, and the rules governing its application, direct the sentencing court to start with the middle term, and to move from that term only when the court itself finds and places on the record facts – whether related to the offense or the offender – beyond the elements of the charged offense." Cunningham, 549 U.S. at 279. "Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." Id. 549 U.S. at 293.

before the <u>Blakely</u> decision.  His conviction became final 90 days after the California Supreme Court summarily denied his petition for review on October 21, 2005, as he did not file a petition for writ of *certiorari*.  SUP.CT. R. 13.4; *see* <u>Caspari v. Bohlen</u>, 510 U.S. 383, 390 (1994) ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of *certiorari* has elapsed or a timely filed petition has been finally decided").  The <u>Cunningham</u> opinion issued January 22, 2007.

On remand, the <u>Black II</u> court applied <u>Cunningham</u>, but again concluded imposition of the upper term did not violate the defendant's jury trial right because one legally-sufficient aggravating factor justified the upper term.  <u>People v. Black ("Black II")</u>, 41 Cal.4th 799 (2007), *cert. denied sub nom* <u>Black v. California</u>, 552 U.S. 1144 (2008).  "The United States Supreme Court consistently has stated that the right to a jury trial does not apply to the fact of a prior conviction." <u>Black II</u>. 41 Cal.4th at 818, *citing* <u>Cunningham</u>, 549 U.S. at 288, <u>Blakely</u>, 542 U.S. at 301, <u>Almendarez-Torres</u>, 523 U.S. at 243.  While a sentencing court must start with the middle term, a single legally-sufficient aggravating factor is enough to justify the court's imposition of an upper term sentence, even if the trial court also relies on other aggravating circumstances not found true by a jury or admitted by the defendant.  <u>Butler</u>, 528 F.3d at 643 ("under California law, only one aggravating factor is necessary to set the upper term as the maximum sentence").  "[I]f one aggravating circumstance has been established in accordance with the constitutional requirements set forth in <u>Blakely</u>, the defendant is not 'legally entitled' to the middle term sentence, and the upper term sentence is the 'statutory maximum'. " <u>Black II</u>, 41 Cal.4th at 813, 816 ("imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions," even if the sentencing court also engaged in additional judicial fact-finding).

Not only does the record reflect Haithcock admitted at least one prison and one strike prior conviction, waiving trial on those charged allegations as established below, but also the line of cases culminating in <u>Cunningham</u> acknowledges an exception to the "bright line rule" of <u>Apprendi</u> requiring

18

jury fact-finding of aggravating factors: **"Except for a prior conviction**, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" Cunningham, 549 U.S. at 288-89 (emphasis added), *quoting* Apprendi, 530 U.S. at 490, 476.  In the Ninth Circuit, the prior conviction exception is a "narrow" one that applies only to "those facts that can be established by the 'prior judicial record' of conviction," not to secondary facts that may relate to the conviction itself but are not reflected in its immediate record. Butler, 528 F.3d at 644-45.  Nevertheless, Haithcock's circumstances appear to satisfy both the defendant's factual admissions exception and the documented prior conviction exception to the Sixth Amendment right to jury fact-finding.  Although Haithcock's sentencing court also made impermissible judicial "qualitative evaluations" in deciding to impose the upper term, "if at least one of the aggravating factors on which the judge relied in sentencing [Petitioner] was established in a manner consistent with the Sixth Amendment, [Petitioner's] sentence does not violate the Constitution."  Butler, 528 F.3d at 648.  On that basis, while the additional judicial factfinding may have been Apprendi error, this Court recommends a finding any such error was harmless.

"To determine whether an Apprendi error was harmless, we must examine the whole record, including the evidence presented by the government at sentencing."  Butler, 528 F.3d at 651.  In connection with a motion to bifurcate trial of the priors allegations, counsel informed the court Haithcock was prepared to waive trial and to admit the priors.  The court confirmed on the record:

> THE COURT: . . . Mr. Haithcock, you've had a chance to discuss your right to a separate trial on the first prison prior allegation and the strike prior allegation?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Do you feel that you understand that right?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  That if the jury does convict you of one of the felony underlying offenses that is charged on the current offenses, then and only then would they go into a second trial, and that would be the trial on whether these allegations of the priors are true or not.  And then that trial takes place, and all 12 jurors would have to be satisfied beyond a reasonable doubt that these priors had taken place before – as alleged before they could make a true finding.
>
> THE DEFENDANT:  Okay.

1    THE COURT:  It's an odd thing.  The jury in that bifurcated trial does
     not decide whether, in fact, it was your prior, that's for the Court to
2    decide, but they do decide whether or not the documentation and other
     evidence is sufficient to show that someone with your name had those
3    priors.

4    THE DEFENDANT:  Yes, I understand.

5    THE COURT:  Okay.  And you also have a right to give up the right to
     a jury trial, if you wish, and to admit that you had these priors.  That's
6    up to you.   Do you wish to admit it?

7    THE DEFENDANT:  Yes.

8    (RT Vol. 4n 49:2-50:2.)

9    THE COURT:  Do you specifically admit – and I'll just read it if you
     want to follow along in the Information.  Do you admit the first prison
10   prior allegation that you served a separate prison term for a felony that
     is alleged there, specifically Penal Code Section 245(a)(1); date of
11   conviction, August 20th, 1999; Court No. SCD 147045 in San Diego
     Superior Court; that you were convicted as it states and as I just read
12   to you; and you went to prison for that offense, and when you were
     released from prison, within the next five years you suffered another
13   felony conviction.  Do you admit that?

14   THE DEFENDANT:  Yes.

15   THE COURT:  And do you admit the strike prior allegation pursuant
     to Penal Code Section 667(b) through (i), and 668, that you had
16   suffered the same prior felony conviction that we just mentioned, . . . .
     and that was a serious or violent felony under California law.  Do you
17   admit that strike prior?

18   THE DEFENDANT:  Yes.
         . . .
19   THE COURT:  Do you wish to admit that it was with personal
     infliction of great bodily injury that makes it fall within the strike
20   category?

21   THE DEFENDANT:  Yes.

22   (RT Vol. 4, 50:17-52:24; *see also* RT Vol. 4, 53:10-21.)

23       Even had Haithcock not admitted his two prior convictions, his Probation Report documents

24   the facts of several other prior felony convictions, a criminal history the trial court expressly relied

25   on to support selection of the upper term sentence.  (CT 79-90.)  "[T]he prior conviction exception [to

26   jury fact-finding] is justified by the reliability of court documents created as part of a process with

27   Sixth Amendment safeguards" to prove the existence of a particular prior conviction.  Butler, 528 F.3d

28   at 645.  Thus, not only did Haithcock admit a prior felony conviction, but also the Probation Report

substantiates Haithcock's multiple other convictions.   Therefore, while the considerations the sentencing court recited as "A", "B", and "C" reasons for selecting the upper term sentence (Lodg. 1, RT Vol. 6 at 354, reproduced and highlighted above) may not survive <u>Cunningham</u> scrutiny,[12] the trial court's permissible consideration of Haithcock's own admissions and the documentation of his other criminal convictions supports the upper term sentence.

Even if <u>Apprendi</u>/ <u>Cunningham</u>/ <u>Blakely</u> judicial fact-finding error occurred, the error had no substantial or injurious effect on his sentence.  *See* <u>Washington v. Recueno</u>, 548 U.S. 212 (2006) (holding that sentencing errors are subject to harmless error analysis); *see* <u>Butler</u>, 528 F.3d at 648-49. "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995), *quoting* <u>Brecht</u>, 507 U.S. at 627.  From Haithcock's extensive prior criminal history documented in the record, it is virtually certain that a jury would have found facts beyond a reasonable doubt to support at least one additional recidivist factor authorizing the aggravated term.  Consequently, on this record, any such error was harmless.

For all the foregoing reasons, it is recommended the Court find Haithcock is not entitled to federal habeas relief from his upper term sentence as the state court result is not contrary to nor an unreasonable application of United States Supreme Court authority, and the state court's factual findings are objectively reasonable.  28 U.S.C. § 2254.  Accordingly, it is recommended relief on Ground Two be **DENIED**.

## III.    CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Michael M. Anello under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.   For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** this habeas petition be **DENIED** in its entirety on grounds the Petitioner is not in custody in violation of any federal right.  **IT IS FURTHER RECOMMENDED** the Court issue

---

[12]  "[T]he exception does not extend to a court's qualitative evaluations of the nature or seriousness of past crimes" or the "likelihood of recidivism" because "such determinations cannot be made solely by looking to documents of conviction."  <u>Butler</u>, 528 F.3d at 644.

06cv0100

1   \\

2   an Order:  (1) approving and adopting this Report and Recommendation; and (2) directing that

3   Judgment be entered denying the Petition.

4        **IT IS HEREBY ORDERED** no later than **May 14, 2010**, any party to this action may file

5   written objections with the Court and serve a copy on all parties.  The document should be captioned

6   "Objections to Report and Recommendation."

7        **IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with the Court and

8   served on all parties no later than **May 28, 2010**.  The parties are advised that failure to file objections

9   within the specified time may waive the right to raise those objections on appeal of the Court's Order.

10  *See* Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th

11  Cir. 1991).

12  DATED:  April 23, 2010

13  

14  Jan M. Adler
    U.S. Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

06cv0100